UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Cozzini Bros., Inc., | | |
| *Plaintiff,* | | No. 25 CV 9444 |
| v. | | |
| Cozzini Cutting Supplies, LLC, | | Judge Lindsay C. Jenkins |
| *Defendant.* | | |

MEMORANDUM OPINION AND ORDER

Cozzini Bros., Inc. ("Cozzini Bros.") provides cutlery products and services (such as knife rental and sharpening) to customers in the restaurant, grocery, and commercial kitchen industries. [Dkt. 1-1, ¶ 13.][1] So does Cozzini Cutting Supplies, LLC ("CCS"), established by a previous owner of Cozzini Bros. [*Id.*, ¶¶ 6, 33.]

Alleging that CCS systematically hired its former employees in order to leverage their customer and pricing information and sell competing products and services, *id.*, ¶ 2, Cozzini Bros. filed this lawsuit in state court bringing four claims: misappropriation of trade secrets in violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 et. seq. ("ITSA", Count One); the Defend Trade Secrets Act, 18 USC 1836 et. seq. ("DTSA", Count II); and the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001 et. seq ("FTSA", Count III), as well as tortious interference with business expectancy (Count IV). [*Id.*, ¶¶ 67–108.] Cozzini Bros. seeks preliminary and permanent injunctive relief with respect to its trade secret claims, *see* Dkt. 1-4 at 6, as well as compensatory and punitive damages. [Dkt. 1-1, ¶ 4.]

After CCS removed the case to federal court, it filed a motion to dismiss, which the court grants in part. [Dkt. 12.]

## I.   Background[2]

Through decades of building long-term customer relationships, Cozzini Bros. has collected a large body of "Customer Information," defined as "the identities of

---

[1]   Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

[2]   The following factual allegations are taken from Cozzini Bros.' complaint [Dkt. 1-1] and accepted as true for the purposes of the motion. *Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

commercial businesses that utilize Cutlery Services, [as well as] detailed information about the specific Cutlery Services needs of each customer, including the specific knives and related goods the customers rent or purchase, how frequently customers receive their Cutlery Services, and the prices the customers pay." [Dkt. 1-1, ¶ 19.] It maintains this information on over one million commercial accounts throughout the United States, including 100,000 active customers and 900,000 prospective customers. [*Id.*] Cozzini Bros. stores Customer Information in a password-protected centralized electronic database. [*Id.*, ¶ 22.]

This Customer Information allows Cozzini Bros. to grow its customer base, maintain repeat business, and keep a competitive advantage over other providers, who would otherwise be able to use its pricing, inventory, and scheduling information to solicit Cozzini Bros. customers by offering similar services at undercutting prices. [*Id.*, ¶ 20.]

Since the early 2000s, Cozzini Bros. has distributed to all employees a written handbook containing its policies on accessing and using Customer Information. [*Id.*, ¶ 24.] Since 2016, the handbook has advised employees that "[i]t is very important" to protect Cozzini Bros.' "confidential business information and trade secrets"; that "when informed of confidential Company information, [employees] must keep it confidential"; and that all employees "are prohibited from using confidential information, except as required in the course of their employment and in furtherance of the Company's interests." [*Id.*, ¶ 25.] Cozzini Bros. generally requires all hires to sign an electronic acknowledgment that they received, reviewed, and understand this handbook. [*Id.*; *see id.*, ¶ 40.] And most Cozzini Bros. employees, like Area Managers and Route Drivers, can only access information on the specific customer accounts to which they are assigned. [*Id.*, ¶ 23.]

In 2010, former co-owner Oswald Cozzini sold most of his interest in Cozzini Bros., though he continued working at the company. [Dkt. 1-1, ¶ 29.] In March 2016, Cozzini established CCS as a limited liability company. [*Id.*, ¶ 33.] And when Cozzini sold his remaining stake in February 2017, he executed a non-competition, non-solicitation, and non-hire agreement that restricted him from soliciting customers and otherwise competing with Cozzini Bros. for a period of five years (i.e., until February 2022). [*Id.*, ¶ 32.] At some point after the February 2017 sale, CCS began hiring former Cozzini Bros. employees who had detailed knowledge of its customers' identities, pricing agreements, and purchasing histories. [*Id.*, ¶ 2.] Route Drivers, for instance, are full-time employees who regularly visit a set of assigned customers on a specific route, serving as Cozzini Bros.'s primary contacts for those clients. [*Id.*, ¶ 18.]

Kenneth Gryzwa and Milton Campos were Route Drivers for Superior Knife, a company acquired by Cozzini Bros., and thus became the latter's employees on April 29, 2024. [*Id.*, ¶¶ 36–40.] In or around May 2024, CCS hired Gryzwa, Campos, and other former Route Drivers to solicit the same Chicago-area customers that they had

worked with on behalf of Cozzini Bros. [*Id.*, ¶ 35.] Neither Gryzwa nor Campos executed a confidentiality agreement with Cozzini Brothers in the short period of their post-acquisition employment. [*Id.*, ¶ 40.]

However, Gryzwa had signed a non-disclosure and non-compete agreement with Superior Knife. [*Id.*] This agreement prohibited Gryzwa from disclosing any information about Superior Knife's customers that Gryzwa "knew to be confidential or that was considered to be a trade secret." [*Id.*] It also prohibited him from working for another business offering cutlery services, as well as from contacting or soliciting any of Superior Knife's customers for Cutlery Services for two years following his employment. [*Id.*] Cozzini Brothers alleges that through purchasing Superior Knife, it acquired all rights to enforce any non-disclosure, non-solicitation, or non-competition agreements with Superior Knife employees. [*Id.*, ¶ 42.]

In or after December 2024, CCS also hired Tomas Munoz, a longtime Route Driver for Cozzini Bros. who had signed a confidentiality agreement that prohibited him from soliciting its customers for two years after his employment ended. [*Id.*, ¶¶ 51, 53–54.]

Robert Peets resigned as Cozzini Bros.'s Area Manager for southeast Florida on July 11, 2024, telling its Director of Service and Delivery for the Southwest Region that he had already begun soliciting Cozzini Bros.'s Florida customers for CCS. [*Id.*, ¶ 45.] In the months that following, CCS also hired at least four Cozzini Bros. Route Drivers in Florida, including Peter Koppekin, to solicit the same customers they had previously worked with on behalf of Cozzini Brothers. [*Id.*, ¶¶ 46–47.] Each Florida employee signed a confidentiality and protective agreement prohibiting him from working for a competitor or soliciting Cozzini Bros. customers for a period of one year after separation. [*Id.*, ¶ 48–49.]

In October 2024, Peets and Koppekin approached customers they had previously worked with through Cozzini Bros. to set up new accounts with CCS. [*Id.*, ¶¶ 57–60.] In these conversations, the CCS representatives offered lower pricing, referencing for comparison what Cozzini Bros. charged, which they only knew from having worked for the latter. [*Id.*, ¶ 58.] At one restaurant, for example, Peets and Koppekin left a box of CCS knives with the restaurant's manager, and later billed the restaurant for the them. [*Id.*, ¶ 59.] At another, the men told the executive chef that Cozzini Brothers had undergone an ownership change, so CCS had taken over and would be their new cutlery service provider. [*Id.*, ¶ 60.]

Cozzini Bros. estimates that CCS has, through these cumulative efforts, successfully solicited at least 500 customers, representing approximately $809,000 in lost annual revenue. [*Id.*, ¶¶ 44, 50, 55.]

## II.   Analysis

### A.   Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a plaintiff's claims. To survive, "a complaint's factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Emerson v. Dart*, 109 F.4th 936, 941 (7th Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This occurs when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Garrard v. Rust-Oleum Corp.*, 575 F. Supp. 3d 995, 999 (N.D. Ill. 2021) (quoting *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018)). The court accepts all well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 522 (7th Cir. 2023); *Reardon v. Danley*, 74 F.4th 825, 826- 27 (7th Cir. 2023). However, conclusory allegations are insufficient to avoid dismissal. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.   Trade Secret Claims

Because the federal DTSA shares the same elements as its Illinois and Florida analogues, these claims can be analyzed together. *Got Docs, LLC v. Kingsbridge Holdings, LLC*, 657 F. Supp. 3d 1034, 1043 (N.D. Ill. 2023); *Compulife Software, Inc. v. Newman*, 111 F.4th 1147, 1160 (11th Cir. 2024). "To prevail on a DTSA misappropriation claim, a plaintiff must show that (1) their information was a trade secret; (2) it was misappropriated; and (3) it was used in the defendant's business." *NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, 163 F.4th 1091, 1096 (7th Cir. 2026). Allegedly misappropriated information constitutes a trade secret if the owner implemented "reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839.

As for reasonableness of confidentiality measures, a plaintiff need only allege "that it employed reasonable confidentiality measures to protect its alleged trade secrets." *Sonrai Sys., LLC v. Waste Connections, Inc.*, 658 F. Supp. 3d 604, 616 (N.D. Ill. 2023); *see also Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 818 (N.D. Ill. 2014) (plaintiff must allege the "efforts to maintain [the trade secret's] confidentiality . . . in general terms"). Where a plaintiff alleges "specific efforts it has taken to protect the business information," that is sufficient to withstand a motion to dismiss. *Covenant Aviation Sec., LLC*, 15 F. Supp. 3d at 818.

"[D]etermining the reasonableness of a given confidentiality measure requires a fact-based inquiry dependent on the specific circumstances." *Sonrai Sys., LLC*, 658

4

F. Supp. 3d at 615. As a result, only in "extreme case[s] can . . . reasonable precaution[s] be determined as a matter of law." *Id.* Here, Cozzini Bros. has sufficiently alleged that its data is confidential, that the confidentiality of that data contributes to its success as a business, and that it therefore goes to great lengths to protect its vast database of Customer Information—such as by password-protecting the database and only allowing employees to access subsets of information relevant to their assigned customers. [*See* Dkt. 1-1, ¶¶ 18, 23.] That suffices for now.

But to establish that the first element, that a trade secret exists, the plaintiff must also "define the allegedly misappropriated secrets with sufficient specificity." *Maxtech Consumer Prods., Ltd. v. Robert Bosch Tool Corp.*, 255 F. Supp. 3d 833, 853 (N.D. Ill. 2017). The Seventh Circuit has noted that this is an exacting standard: a plaintiff must define claimed trade secrets with a "high level of specificity." *REXA, Inc. v. Chester*, 42 F.4th 652, 663 (7th Cir. 2022).

Cozzini Bros.'s complaint falls short. Though Cozzini Bros. asserts in its briefs in support of its motion for injunctive relief and in response to CCS's motion to dismiss that "its pricing and product purchasing information for specific customers may constitute trade secrets," [Dkt. 16 at 4], nowhere does the complaint adequately and specifically describe what the trade secret information is comprised of. [*See, e.g.*, Dkt. 1-1, ¶¶ 74, 86, 95 (in each paragraph stating, without defining, that "given Oswald's intimate knowledge of Cozzini Bros.' business operations," CCS misappropriated "Cozzini Bros.' trade secrets" and will continue to do so).]

Cozzini Bros. quotes the employee handbook to allege that Cozzini Bros. "advised employees that it is very important to protect Cozzini Bros.' confidential business information and trade secrets, including customer lists and pricing information." [*Id.*, ¶ 25 (cleaned up).] But the statement "including customer lists and pricing information" leaves ambiguous whether "customer lists and pricing information" constitutes the trade secret, or just confidential information more broadly. *See Miller UK Ltd. v. Caterpillar Inc.*, 859 F. Supp. 2d 941, 944 (N.D. Ill. 2012) ("Not all confidential information is a trade secret"); *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) (noting that trade secrets are a "subset of all commercially valuable information").

It is true that customer lists and pricing information may qualify as trade secrets under certain circumstances. *See, e.g.*, *Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, 2023 WL 5334638, at *14 (N.D. Ill. Aug. 18, 2023) ("Customer lists, meaning a business's collection of customer identities, are protectable trade secrets."); *APC Filtration, Inc. v. Becker*, 646 F. Supp. 2d 1000, 1010 (N.D. Ill. 2009) (customer list constituted trade secret when company spent twelve years developing the list and tailored pricing information).

But customer information does not warrant protection if it is "generally available to employees, known by persons in the trade, or easily found in telephone

5

directories and industry directories." *Chicagoland Aviation, LLC v. Todd*, No. 12cv1139, 2012 WL 5948960, at *5 (N.D. Ill. June 8, 2012); *see Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("[I]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.") And here Cozzini Bros. does not meaningfully engage with CCS's argument that pricing information for each customer was disclosed to that customer without restriction. [*See* Dkt. 12-1 at 10–11.]

Comparison with other cases where plaintiffs sufficiently described their trade secrets illuminates the deficiencies here. For example, in *Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, the plaintiff's allegations were sufficient where it described its trade secrets as including current and prospective customer lists, lists of current and prospective suppliers, "combinations or compilations of materials necessary to create [certain products and services]," and marketing plans and advertising strategies. 799 F. Supp. 2d 846, 850 (N.D. Ill. 2011). In another case, the plaintiff's description explained its confidential information included "a method for collecting standardized data," "software design specifications," and "impact reports and analytics." *Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 921–22 (N.D. Ill. 2016). Here, a "high level of specificity" is absent. *REXA, Inc.*, 42 F.4th at 663.

Cozzini Bros. does allege that it devoted substantial resources over many years to identifying commercial businesses that purchase Cutlery Services and to developing long-term relationships with those customers. [Dkt. 1-1, ¶ 17.] The complaint also alleges that in addition to customer identities, it has learned information about customers' specific Cutlery Needs, "including the specific knives and related goods the customers rent or purchase, how frequently customers receive their Cutlery Services, and the prices the customers pay," that is, its Customer Information. [Dkt. 1-1, ¶ 19.]

These "blanket generalizations" are insufficient. *Thermal Zone Prods. Corp. v. Echo Eng'g, Ltd.*, No. 1993 WL 358148, at *5 (N.D. Ill. Sept. 14, 1993) (dismissing trade secret claim where plaintiffs merely alleged that their trade secrets consisted of "over 3000 pages of technical information, including drawings, plans, and specifications"). Its general, non-specific references to customer identities and pricing information do not identify "concrete secrets" or "direct[] [the Court] as to how [its] information is unique and protected." *Id.*

At bottom, the complaint stops short of alleging that CCS acquired or has possession of an actual customer list or pricing database. It alleges only that CCS hired former Cozzini Bros. employees who were able to remember businesses they previously visited on a regular basis, and who then contacted those customers for CCS to offer better pricing. Even assuming some employees breached their restrictive

covenants, that's a separate question from whether Cozzini Bros. has adequately alleged misappropriation of trade secrets.

The complaint fails to adequately allege that a trade secret existed. Absent that, Cozzini Bros. fails to state a claim.[3]

### C.   Tortious Interference with Business Expectancy

Under Illinois state law, an intentional interference with a business expectancy claim requires "(1) the existence of a valid business expectancy by plaintiff, (2) the defendant's knowledge of the expectancy, (3) the defendant's intentional and unjustified interference which prevents the realization of the business expectancy, and (4) damages." *Mannion v. Stallings & Co.*, 561 N.E.2d 1134, 1139 (Ill. App. Ct. 1990).

Here, Cozzini Bros. claims that CCS intentionally interfered with existing business relationships that it expected to continue through deceptive behavior. This includes, for example, sending former Cozzini Bros. employees to mislead customers into believing that CCS had replaced Cozzini Bros. or that there had been some kind of ownership change and that CCS would be "taking over." [Dkt. 1-1, ¶¶ 56–62, 103.] These allegations suffice.

Instead of disputing that the claim's elements are not satisfied, CCS contends that this count is preempted by the ITSA. *See* 765 Ill. Comp. Stat. Ann. 1065/8 (expressing displacing "conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret.") The ITSA preempts a tortious interference claim if the claim is "wholly dependent on the existence of the allegedly misappropriated information." *Arjo, Inc. v. Handicare USA, Inc.*, 2018 WL 5298527, at *8 (N.D. Ill. Oct. 25, 2018).

Here, Cozzini Bros. does not merely re-state that CCS tortiously interfered with its relationships with third-party customers using trade-secret information. C*f. Sentry Pool v. Wave Tec Pools, Inc.*, 2008 WL 3200837, at *4 (C.D. Ill. Aug. 6, 2008) (interference with business relationships claim preempted by ITSA because plaintiff alleged with respect to both claims that defendants sent trade-secret materials to plaintiff's competitor); *Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968, 974 (N.D. Ill. May 1, 2000) (same where plaintiff alleged that defendants tortiously interfered with its business relationships by misappropriating trade secrets and confidential information). Instead, Cozzini Bros. makes independent allegations that CCS misrepresented to customers that "there had been an ownership change [at Cozzini Bros.], and that CCS had taken over and would be their new Cutlery Service

---

[3]    Cozzini Bros. also invokes the inevitable disclosure doctrine to argue that its former employees are likely to use trade secret information they learned while working at Cozzini Bros. in their new positions at CCS. Because Cozzini Bros. has not sufficiently defined what its trade secret information entails, the court does not reach this argument.

provider." [Dkt. 1-1, ¶¶ 60, 103.] Because this claim does not wholly rely on CCS's misappropriation of Cozzini Bros.'s confidential customer information to provide competing services, ITSA preemption does not apply.

Other courts have found that claims for tortious interference may survive when a plaintiff alleges that defendants made false statements that caused him to lose potential customers. *E.g.*, *Manley v. Boat/U.S. Inc.,* 2014 WL 1647117 at *2–4 (N.D. Ill. April 23, 2014) (concluding that the plaintiff's tortious interference claim survived a motion to dismiss where the complaint alleged that defendants made false statements about plaintiff, including that plaintiff had gone out of business, had gone bankrupt, and that its license had been revoked, plaintiff identified potential customers that it lost because of the statements); *see also XPO Logistics, Inc. v. Best Dedicated Sols., LLC*, 2017 WL 4150779, at *3 (N.D. Ill. Sep. 18, 2017) (tortious interference claim not preempted where defendant solicited and induced plaintiff's employees to breach their non-solicitation agreements). At this stage, Cozzini Bros. has sufficiently alleged the elements of a tortious interference claim.

## IV.     Conclusion

For the reasons stated above, the court dismisses the trade secret claims, Counts One, Two, and Three, without prejudice. Having dismissed Cozzini Bros.'s trade secret claims, CCS's motion is otherwise denied.

Enter:       25-cv-9444
Date:        March 13, 2026

_____
Lindsay C. Jenkins

8